You may proceed. May it please the Court. My name is Sarah Batten with Birch, Horton, Bittner & Chereau, and we represent Appellant First National Bank Alaska. I'd like to please reserve two minutes for rebuttal. This is a contract interpretation case that turns on the interpretation of two bank loan documents, a 2009 security agreement and a 2013 security agreement. The principal question at issue in this case simply stated is, does the integration clause in the 2013 security agreement trump the future advances clause in the 2009 security agreement? The answer is no. The 2009 security agreement granted a lien on Omni's deposit account, which secured future advances, including future advances made after any period of time where there was no loan balance owing. There are three reasons why the integration clause in the 2013 security agreement does not trump or otherwise preclude enforcement of the 2009 security agreement's future advances clause. First, the 2013 security agreement's integration clause expressly provides that related documents are incorporated into the agreement and the 2009 security agreement is a related document by definition. Second, the 2013 security agreement's integration clause did not preclude enforcement of the 2009 security agreement because it covered a different subject matter. Third, the 2013 security agreement's election of remedies clause allows enforcement of the 2009 security agreement as, quote, an other writing. I'll focus my time on these three reasons because the plain language of the 2009 security agreement confirms that the payoff of the 2009 loan did not invalidate the 2009 security agreement's future advances clause.  This is a continuing security agreement and will continue in effect even though all or any part of the indebtedness is paid in full and even though for a period of time, grantor may not be indebted to lender. The first reason why the 2009 future advances clause is not precluded by the 2013 integration clause is because the 2009 security agreement is a related document integrated into the 2013 agreement. Under the 2013 agreement's definition, in order to be a related document, the 2009 security agreement must be an existing security agreement that was, quote, executed in connection with the indebtedness. We will get to the meaning of indebtedness, but first, what does it mean to be executed in connection with? Under the definition of related document, there is no requirement that the security agreements be signed contemporaneously or close in time. The definition simply states that the security agreement may be now existing or hereafter existing. This definition allows the related document to predate or post-date the 2013 loan  Didn't your client release its UCC filings after payment on the 2009 agreement? Yes, but deposit accounts are In the ordinary world, you've got a security agreement, and the way it attaches is through UCC filings, and you release those. Doesn't that suggest that the parties thought everything was over? No, and the reason is because deposit accounts are perfected by control, and the UCC filing is only perfection for security that is perfected by UCC filings, and in this case, the deposit account is not perfected by a UCC filing. So the UCC filing is completely irrelevant in this case, and to the extent that the trustee is using it to show an intent of the parties, we don't look at intent to the parties for the reasons that you look only to the contract language when the contract is unambiguous. The UCC was revised in 2001, and the UCC specifically abrogated the true intent of the parties test. So here we only look to what the contract says, and the contract says what it says. So the question really becomes, is there enough of a relationship between the 2009 security agreement and the 2009 loan for the 2009 agreement to have been executed in connection with the 2013 loan? The answer is yes, because executed is defined as a document that has been signed or that has been done, given, or performed. The 2009 security agreement was executed in connection with the 2013 loan because the future advances clause in the 2009 agreement could only be done, given, or performed when the future advance was actually given. Because the parties agreed that the 2009 security agreement would apply to future advances, and that future advance clause is only triggered when the future advance is given, it makes sense then that the 2009 security agreement was executed in connection with the 2013 loan. Next, the word indebtedness in this phrase uses a capital I. So in order to understand the scope of the indebtedness covered, you have to look to the definition of indebtedness in the 2013 security agreement, which states, the word indebtedness means the indebtedness evidenced by the note or related documents. So to get the total scope of the indebtedness covered by the 2013 agreement, you have to take the indebtedness under the 2013 note, and you add it to the indebtedness covered under the related document, the 2009 security agreement here. To add the 2009 security agreement's indebtedness, you have to go to the definition of capital I, indebtedness, in the 2009 agreement, which states that indebtedness includes future advances. In fact, it says, quote, specifically without limitation, indebtedness includes the future advances set forth in the future advances provision, together with all interests thereon and all amounts that may be indirectly secured by the cross-collateralization provision of this agreement. In other words, the 2013 loan is both a present advance under the 2013 security agreement and a future advance under the 2009 security agreement, and so it fits in the definition of indebtedness in both these ways. And this is how the 2009 agreement is a part of the 2013 agreement's total indebtedness by definition. Finally, the 2009 security agreement was executed in connection with the indebtedness, the 2013 loan, because that was the reasonable expectations of the parties. The goal of contract interpretation is to enforce the reasonable expectations of the parties. When Omni signed the 2009 security agreement, Omni consented to the future advances and cross-collateralization language in the agreement, so that at that time, in 2009, Omni reasonably expected the 2009 agreement to secure future advances. The 2009 security agreement was never terminated, so the future advances and cross-collateralization clauses remained in effect. If all of that is true, why was it necessary to have the 2013 security agreement? Well, the 2013 security agreement secures different collateral, and I'll talk about that coming up, and in fact, I can just jump to it right now. The second reason that the integration clause in the 2013 security agreement does not preclude enforcement of the 2009 security agreement is because the two agreements covered different subject matters. The 2013 securities integration clause states, this agreement, together with any related documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this agreement. What are the matters set forth in this agreement? Matter is defined as the subject under consideration. The subject under consideration in the 2013 agreement was the specific grocery store equipment listed in Exhibit A to the 2013 security agreement. Therefore, where another security agreement grants security interest in different collateral, it is not precluded by the integration clause from securing the loan. What was the indebtedness at the time the 2013 agreement was executed? The 2013 loan plus the future advances clause in the 2009 agreement. That's when you go to the definition of indebtedness. It says that you look to... I understand what you're saying. Yes. But at the moment, the 2013 security agreement was executed, how much was the bank owed? It was owed whatever... You're looking for an amount. Right. Was it $1, $10, $3 million? What was it? No, it was the $2.3 million, I believe. I actually don't have the exact amount that was owed. I know that the 2013 loan was for $2.3 million or $2.6 million. There's a loan applied for in a security agreement in 2013. Yes. And there was $2.3 million advanced on that as a result of that loan? Yes. So I'm looking for the moment before the execution of that 2013 security agreement. Right. How much was owed? Nothing was owed before the 2013 loan. Thank you. Thank you. Yes, there... Because it had been paid off. Right. The 2009 loan had been paid off in 2011. And then this was the next future advance was the 2013 loan, which was the future advance. But your argument is, well, even though it's paid off and discharged, that because of the language in the 2009 agreement, it lasts forever. Yes. It lasts so long as... What about the rule against perpetuities? Well, that doesn't apply in this case for the contract law. It applies so long as Omni continued to take out loans or until the parties mutually terminated the agreement. Omni could have taken a loan out from somebody else. It could have terminated the agreement, or it could have moved its deposit account to another bank. But if Omni 100 years from now had taken out a loan, your position is that, okay, now it's 2118. We go back to the 2009 agreement to help us interpret what the 2118 agreement means. Yes, because the here and after loans are covered by the 2013 security agreement. That's correct. I know that makes no practical sense, but I understand your contract argument, and the question is what do you do when you have sophisticated parties but there's an ambiguity? Well, if there's an ambiguity, then the court has the ability to construe the information in the contract and may also look to other case law and extrinsic conduct to evaluate that. But in this case, there is no ambiguity. The 2009 future advances clause granted a security agreement in the deposit account, and this is exactly the situation that happened in Alaska Fur Gallery where the court looked at the future advances clause and applied only the language in the agreement. It didn't look to any other extrinsic conduct, and I see that I'm running into my time, so I'll reserve the rest. Thank you. Thank you. May it please the Court, my name is Cabot Christensen. I'm the attorney for Nicole Jipping, trustee, and Ms. Jipping is here in the courtroom. Even though this is an appeal from a federal bankruptcy court, there are no contested federal issues and no contested bankruptcy issues on this appeal. All the issues are governed by substantive Alaska law. What we're dealing with here is two very similar contracts, the 2009 security agreement, which was paid off, which secured a loan that was paid off in 2011, and a 2013 security agreement, both of which are to be interpreted under Alaska law. There are two main issues to resolve, and taking them in chronological order, the first is whether the security agreement, the 2009 security agreement, expired by its own terms once the indebtedness as defined in that agreement was paid off in 2011. Chronologically, the second issue is whether the integration clause in the 2013 security agreement precludes the use of the 2009 security agreement. The bank needs to win both issues in order to prevail. If the trustee wins on either issue, then the trustee prevails. Judge Gleason, who was herself an Alaska Superior Court judge for 10 years before she became a federal district court judge, decided the Alaska state law issues. She saw that the second or the chronologically the second or the integration issue was dispositive, and so she did not address the chronologically first issue, which was whether the earlier agreement had expired by its own terms. So let's preliminarily let's remind ourselves why the 2013 security agreement even exists in the first place. It has one and only one purpose, and that is to describe the security or the collateral that secures payment of the 2013 note. There's no other reason for the 2013 security agreement to exist. In fact, if you look at the side-by-side definitions of the collateral in the two agreements in the brief, it's clear that there's a huge overlap and perhaps even that the 2013 collateral is a complete subset of the 2009 security agreement. So if anybody intended for the 2013 agreement to define the scope of the agreement, define the scope of the collateral, the first question is how do you explain the overlap or, as I say, subsetness of the collateral in the later agreement? But in order to work through the issue of whether the integration clause in the 2013 agreement applies and how it applies, there's a web of definitions that we have to work through. In the 2013 agreement, the term agreement is a defined term and refers only to the 2013 agreement. It's not the 2009 agreement. The term note in the 2013 security agreement is another defined term and only refers to the 2013 note. The term indebtedness in the 2013 agreement means the indebtedness evidenced by the note or by the related documents. Working through the web here, the term related documents in the 2013 security agreements provides in relevant part that it means the promissory note and other loan documents whether now or hereafter existed executed in connection with the indebtedness, capital I indebtedness. So right off the bat, we have a circularity problem. The definition of capital I indebtedness says that it's the small I indebtedness evidenced by the note or the related documents. But the related documents definition means anything executed in connection with the capital I indebtedness. So the indebtedness is the related documents and related documents is the indebtedness. It's circular. The trustee's position is that the indebtedness here means the 2013 note, that the 2013 security agreement is a related document because when the party sat down and closed the loan, the set of loan documents executed at that time constituted what the parties intended to be a complete set of the relevant loan documents. And that is to say a complete set of all the documents executed in connection with the capital I indebtedness. There's nothing in the 2013 loan documents or any other document executed at or after the 2013 loan closing that suggests that the parties intended that the 2009 security agreement have any application. So really the most natural reading of the circularity between the definitions of indebtedness and related documents is that the related documents component of the indebtedness definition is an empty category and that the indebtedness means only the 2013 note. The bankruptcy judge reached an opposite conclusion, but even Judge Ross admitted that his construction of the documents is somewhat circular, chicken and egg, and exceedingly obscure. Judge Gleeson, on the other hand, who reversed Judge Ross, found that a more natural reading of the related documents clause favors the trustee position, that Alaska law calls for ordinary words to be given their ordinary meaning. It's more logical to construe the in connection with the indebtedness phrase in the 2013 security agreement to refer only to those documents executed with respect to the 2013 loan. And of course it is a well-established principle of contract law in Alaska and everywhere else that ambiguities in a contract are construed against the drafter. The very, very, very best that can be said in favor of the bank's argument is that there is an exceedingly obscure, somewhat circular, chicken and egg interpretation that reaches the conclusion that the bank wants to reach. But that analysis itself, that statement that there is an obscure, circular way to get to the bank's position itself supports the trustee's interpretation because ambiguous provisions are construed against the bank because the bank drafted the document. There would be some bizarre results that would obtain if the bank's argument were correct. For one thing, there really is, as I think I've already indicated, there really is no need for the security, if the bank is right, there's no need for the 2013 security agreement at all because under the bank's argument all the bank has to do is file a UCC in 2013, rely on the 2009 security agreement, done. That's crazy. No bank officer, no bank lawyer would support that kind of interpretation. And if in 20 or 30 or 40 or 50 years or three years, whenever, down the road, Omni comes back into the bank, the First National, assume no bankruptcy, assume the business continues, and Omni says, I'd like to borrow another million dollars, and the loan officer says, sure, here, sign the note, here's the million dollars, we'll file a UCC, but don't worry, we don't need a security agreement because throughout all these years there's been kind of a free-floating, unperfected security interest in all the collateral other than the deposit accounts. Sort of a brooding Omni presence in the sky. Like the vampire who cannot be killed because he's already dead. You're right, the loan's been paid off, but it doesn't matter, you can't get rid of it. And that's crazy, that doesn't make any sense. The UCC says that a security agreement secures an obligation, but under the bank's view, the security agreement exists even though there is no obligation. That concludes my presentation. If the Court has any questions, I'd be glad to answer. Thank you. Thank you. Well, it's actually not crazy. The future advances clause, the parties are able to contract and they can agree to a future advances clause, and when they don't want that security agreement to be effective anymore, they have the ability to terminate that or to go elsewhere for their loans. These contracts are not ambiguous. They're also not circular. The reasoning is linear. It seems like it's circular because you're looking at the definition of indebtedness in two different documents, but that does not make it circular. And also, in two other cases, in Matter of Kasmirak and In re Tulsa, cited in the brief, the courts enforced future advance clauses after the loans were paid, and the trustee does not even address the rights and remedies clause, whereas here there is a clause in the 2013 agreement that grants rights and remedies under other writings. So even if the 2009 security agreement doesn't fall into the category of related documents, which we submit that it does, then it would be enforceable as an other writing under the rights and remedies clause, and the trustee does not provide any, says that it's prohibited by law, but there is no law that prohibits the rights and remedies clause, and the rights are cumulative. In both Sobol Limited versus Deutsche Bank and Bank Julius versus Waxfield, cited in the briefing, courts analyzed integration clauses and held that the integration clause in the subsequent contract did not void a previous contract because the subsequent agreement stated that the rights and remedies were cumulative. And that's the same situation here. The rights and remedies are cumulative. Thank you. Thank you. I'd like to thank both counsel for the argument this morning. Very interesting interpretation question. The case of Jipping versus First National Bank Alaska is submitted. We're adjourned for the morning.
judges: Hawkins, McKeown, Owens